UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

NATIONAL CASUALTY COMPANY,

        Plaintiff,

v.

CAROLINA CASUALTY INSURANCE COMPANY,
PRAETORIAN INSURANCE COMPANY and
KENNETH JOHN SNYDER,

        Defendants,

and                                                     Case Number 09-14305
                                                           Honorable Julian Abele Cook, Jr.

KENNETH JOHN SNYDER,

        Cross-Plaintiff

v.

CAROLINA CASUALTY INSURANCE COMPANY,
and PRAETORIAN INSURANCE COMPANY,

        Cross-Defendants,

and

KENNETH JOHN SNYDER,
        Counter-Plaintiff,

v.

NATIONAL CASUALTY COMPANY,

        Counter-Defendant.
_____/

1

ORDER

In this declaratory judgment action, the Court is charged with the responsibility of determining which of three insurance companies, if any, is responsible for assuming and paying personal injury protection ("PIP") benefits to Kenneth John Snyder who was injured in a one-vehicle accident while he was operating a tractor-trailer. The Plaintiff, National Casualty Company ("National"), asks the Court to resolve this issue according to (1) the no-fault insurance law in Michigan, and (2) various insurance policies that have been issued by National, the Praetorian Insurance Company ("Praetorian"), and the Carolina Casualty Insurance Company ("Carolina").

Currently pending before the Court are three motions by these insurance companies, all of which are seeking to obtain the entry of a summary judgment in their favor. For the reasons that have been stated below, the motion by National and Praetorian will be granted. However, the request by Carolina for the entry of a summary judgment must be denied.

I.

Kenneth Snyder, a Michigan resident who has worked as a truck driver since 1981, lives in Morenci, Michigan with his long-time fiancé, Linda Dombrowski. In connection with his work, Snyder owned a 1998 Peterbilt tractor, which he was purchasing under a lease agreement with Generic Financing and Leasing Corporation. He and Dombrowski jointly "owned" a 1993 Transcraft trailer which they were in the process of purchasing from Dennis Reckner. Both the tractor and trailer were registered in the State of Ohio.

Through an arrangement which appears to be common in the trucking industry, Dombrowski leased the 1998 Peterbilt tractor and the 1993 Transcraft trailer to Northern Steel

Transport Company ("Northern Steel") in April of 2008. As a federally-authorized interstate motor carrier, Northern Steel entered into an "independent contractor lease agreement" with her in which she was required, as the lessee, to maintain insurance coverage for the tractor and trailer, but only (1) for property damage and public liability insurance, and (2) when the equipment was "being used in the transportation of motor vehicle traffic" for Northern Steel, as opposed to another carrier. Northern Steel complied with its obligations under the lease by maintaining a commercial insurance policy from National.[1]

The terms of the independent contractor lease agreement required Dombrowski, as the lessor, to maintain so-called "bobtail insurance coverage," which is designed to protect the tractor and the driver of a rig when it is operated without cargo or a trailer. She satisfied this contractual obligation by securing a policy through Praetorian. By its terms, coverage is not provided under the Praetorian policy if the vehicle is used (1) "to carry property in any business or in route for such purpose," or (2) "while in the business of anyone to whom the auto is rented," or (3) when it is "under motor carrier direction, control or dispatch." (Praetorian Policy and Certificates, Exh. M to Pl's. Mot. for Summ. Judgmt). Coverage is also precluded "with respects [sic] to an owned automobile while such automobile is in the custody of a lessee under a written lease agreement which requires the lessee to provide insurance thereon unless insurance is specifically provided by an endorsement to this policy." The Praetorian policy includes an endorsement for PIP benefits.[2]

The parties acknowledge that while the trailer was owned and insured in Dombrowski's

---

[1] This policy was in effect on the date of the accident.

[2] The parties do not agree whether this provision in the Praetorian insurance policy has any applicability in this litigation.

3

name, she and Snyder had an agreement that the vehicle belonged to him. In this regard, they agreed that (1) she generally played no role in his trucking business, and (2) all of his earnings from this business venture belonged to him.

On Friday March 13, 2009, Snyder completed a successful delivery in Gary, Indiana on behalf of Northern Steel. Soon thereafter, Northern Steel advised Snyder that it did not have any other loads for him to handle on that day. He then sought and received permission from Northern Steel to engage in a "trip lease"[3] with another trucking company. Thereafter, O&I Transport ("O&I"), after being contacted by Snyder, advised him that it did have a load of steel which could be picked up by him in Gary, Indiana. He was instructed that the load was to be delivered to Walbridge, Ohio prior to 11:00 a.m. on Monday, March 16, 2009. Snyder accepted this obligation, agreed to take the delivery, and signed a "trip lease" with O&I on the same day.[4] Under this trip lease arrangement, Snyder and O&I agreed that "exclusive possession, control, use and responsibility for the operation of the equipment . . . shall be that of the Lessee from the time the Lessee takes possession of the equipment . . . ." (Trip Lease ¶ 2). The contract noted specifically that O&I's exclusive possession, control, use and responsibility would last until "possession of the equipment is surrendered to the Lessor and the Lessor issues a receipt to the Lessee specifically identifying the equipment, date, and time of day possession was returned to it" or "until possession of the equipment is returned to the Lessor or given to another carrier in an interchange of equipment

---

[3] The term, "trip lease" is generally utilized in the trucking industry to mean that, notwithstanding a driver's "permanent lease" arrangement with one trucking firm, he is given authority to secure a load from another trucking company.

[4] Although Dombrowski was identified as the owner/lessor in the trip lease, the document was signed by Snyder.

where such is contemplated." (*Id.*). The trip lease (1) required O&I as the Lessee to maintain insurance "for the protection of the public,"[5] (Trip Lease ¶ 10) and (2) obligated Dombrowski - as the Lessor - to maintain the bobtail insurance, which she had maintained through Praetorian.

After picking up the load of steel in Gary, Indiana on March 13th pursuant to the trip lease, Snyder drove to Fayette, Ohio, to a truck stop near his home. According to Snyder, he could not drive the tractor-trailer home while it was loaded, based on the "frost laws" that had been posted near his home and were in effect. Nevertheless, in light of these frost laws, he arranged for Dombrowski to pick him up and left his loaded vehicle at a truck stop.

Snyder delivered the steel by driving to Walbridge, Ohio and arriving at the designated location at approximately 10 o'clock on the following Monday. Prior to his arrival in Walbridge, Snyder contacted Northern Steel by whom he was told that there were no other jobs left for him. (Snyder Dep. at 71-73). Thereafter, Snyder headed home, but prior to reaching his destination, he became involved in a single vehicle accident. According to Snyder, one of his tires hit a rut in the gravel which, in turn, caused the entire tractor-trailer to pull off of the road, resulting in injuries.

Four days later (March 20, 2009), Snyder and Dombrowski traveled to Butler, Indiana to receive payment for his work on the O&I transportation assignment. Upon his arrival, he delivered the trip lease, delivery receipt, and driver log to an O & I agent, known only to Snyder as "Trish." The parties agree that because of the apparent sloppiness by Snyder in handling the trip lease document, the driver's log and the "release of equipment" section bore an incorrect date of March

---

[5]O&I complied with its obligation by acquiring a policy with Carolina.

13, 2009.[6] Notwithstanding, Dombrowski was paid for the trip upon O & I's receipt of Snyder's paperwork.

Thereafter, differing views among the parties over their respective contractual obligations began to emerge. According to Thomas Schantz (safety director for O&I), his company had received paperwork which purportedly released the equipment back to Snyder on March 20, 2009. More importantly, Schantz indicated that trip leases do not necessarily end when a load is delivered. Rather, it was his view that O & I would remain obligated to insure a driver under the terms of a trip lease until the driver (1) returns the vehicle to its home terminal/garaging location where the rig is usually stored, (2) takes on a load for another motor carrier, or (3) signs another trip lease. (Schantz Dep., 89-95).

When the accident was reported, National began making payments to Snyder under the terms of its no-fault policy with Northern Steel. However, it now claims that these payments were mistakenly remitted to Snyder. Acting on the strength of this revised interpretation of its contractual obligations to Snyder, National ceased its payments and filed this lawsuit in an effort, among other things, to recover its monies. All three insurance companies have moved for the entry of a summary judgement as to which of them, if any, is liable to pay benefits to Snyder as a result of the accident.

II.

The Defendants seek the entry of a summary judgment on the basis of Fed. R. Civ. P. 56(c). A case may be resolved with the entry of a summary judgment where "the pleadings, the discovery

---

[6]These parties concede that the date thereon was incorrect since the steel was not delivered for O&I transport until March 16, 2009.

6

and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." *Id.* In exploring such a request, the district court must view the evidence in a light most favorable to the non-moving party. *60 Ivy Street Corp. v. Alexander*, 822 F.3d 1432, 1435 (6th Cir. 1987).

An issue is "genuine" if it contains evidence upon which a jury could find in favor of the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The burden of proof rests upon the moving parties to affirmatively demonstrate the absence of all genuine issues of a material fact in the record. *Gregg v. Allen-Bradley Co.*, 801 F.2d 859, 861 (6th Cir. 1986).

### III.

One of the keys to resolving the dispute between the parties is a determination of whether the trip lease between O&I and Snyder had officially "ended" when the accident occurred. For guidance, the Court looks to the language in the trip lease, as well as the pertinent insurance contracts, all of which must be interpreted in accordance with Michigan law. The rules for construction of insurance agreements are the same as they are for any other written contract. *Comerica Bank v. Lexington Ins. Co.*, 3 F.3d 939, 942 (6th Cir. 1993). Namely, under those principles, the Court must "determine, and then enforce, the intent of the parties based on the plain language of the agreement." *Harbor Park Market, Inc. v. Gronda*, 277 Mich. App. 126, 130 (2007); *see also Quality Prods. & Concepts Co. v. Nagel Precision, Inc.*, 469 Mich. 362, 375 (2003). "If no reasonable person could dispute the meaning of ordinary and plain contract language, the Court must accept and enforce the language as written." *Harbor Park* at 130.

Upon reviewing the record here, the Court finds that there is no genuine issue of a material fact as to whether the trip lease was still in effect on March 16, 2009 at the time of the accident.

By its terms, the trip lease vested "exclusive possession, control, use and responsibility for the operation of the equipment . . ." in O&I as the Lessee, "from the time [it] takes possession of the equipment," until:

> (A)  possession of the equipment is surrendered to the Lessor and the Lessor issues a receipt to the Lessee specifically identifying the equipment, date and time of day possession was returned to it, or
>
> (B)  until possession of the equipment is returned to the Lessor or given to another carrier in an interchange of equipment where such is contemplated.

(Trip Lease at ¶ 2). Given the nature of the arrangement here, the tractor and trailer would have never been physically transferred from Snyder to O&I in the manner provided in ¶2(B). Thus, under a plain reading of the contract, O&I's exclusive possession, control, use and responsibility of the rig only ends when the events paragraph (A) take place; to wit, when the equipment is "surrendered" to Dombrowski / Snyder, *and* when he as the Lessor issues a receipt to O&I specifically identifying the equipment, as well as the date and time possession thereof was returned to him. None of the parties dispute that this language provides the proper framework for determining when the trip lease "ended."

Nevertheless, Carolina insists that the trip lease ended before the March 16th accident occurred because, in its opinion, the load had already been delivered for O&I and "[Snyder] had already tried to find at least one other load he could deliver [and] [w]hen that proved unsuccessful, he decided to go home to change some tires on the trailer." (Carolina Brief at 9). Yet, in the judgment of this Court, Carolina's reasoning is flawed because it has failed to acknowledge the requirements of ¶ 2(A) of the trip lease. This clear and unambiguous language must be enforced as written. Here, the undisputed testimony (from Snyder and Schantz) establishes that the receipt

which released the equipment back to Snyder was not submitted to O&I until March 20, 2009 - several days after the accident. Accordingly, O&I's liability under the trip lease remained in tact at least until that date. This finding is buttressed by additional testimony from Schantz who understood that as a motor carrier, O&I was obligated under the trip lease to provide continuing insurance to a driver until he returned to his home garaging location. Then - and only then in his judgement - would a trip lease be viewed as having been terminated.(Schantz Dep. at 89-96). Here and with obvious recognition that Snyder was involved in the accident before returning the truck to its usual garaging location, the only reasonable inference to be drawn from the evidence is that the tractor-trailer continued to be insured by O&I according to the terms of the trip lease.[7]

Carolina submits that it should not be held liable for providing PIP benefits to Snyder because it was not the owner of the tractor-trailer at the time of the accident according to the language of its contract with O&I. In deciding whether a party is entitled to receive benefits under an insurance contract, a Court is compelled to ask whether the insurance policy provides coverage to the insured; and if so, whether the coverage is negated by an exclusion. *Heniser v. Frankenmuth Mut. Ins. Co.*, 449 Mich. 155, 172 (1995). "An insurer is free to define or limit the scope of coverage as long as the policy language fairly leads to only one reasonable interpretation and is not in contravention of public policy." *Id.* at 161. Accordingly, a court may not hold an insurer liable for a risk that it did not assume. *Besic v. Citizens Ins. Co. of the Midwest*, 290 Mich. App. 19, 24-25 (2010). Thus, it is the insured's burden to establish that his claim falls within the terms of

---

[7]National, Praetorian, and Snyder are in agreement that if the Court finds that the trip lease was still in effect, Carolina is the entity who is responsible for finding providing PIP benefits. In light of the holding that there is no reasonable dispute about whether the trip lease had ended, the Court declines the invitation to analyze Praetorian's liability, if any, for the bobtail coverage or National's general liability.

the policy." *Heniser* at 172 (quotation marks and citation omitted).

The Carolina policy at issue here contains a specific endorsement for Michigan no-fault coverage, noting that it "will pay personal injury protection benefits to or for an 'insured' who sustains 'bodily injury' caused by an 'accident' and resulting from the ownership, maintenance or use of an 'auto' as an 'auto.' These benefits are subject to the provisions of Chapter 31 of the Michigan Insurance Code." (Carolina Policy at CA 22 20 03 08, Endorsement for Michigan Personal Injury Protection, ¶ A). Yet, this and other provisions of the contract were subject to general declarations that the policy only provides coverage for covered autos designated by symbol "5" which refers to those owned "autos" that are subject to the limitations of no-fault laws. Carolina described such autos as "only those 'autos' you own that are required to have [no-fault] benefits in the state where they are licensed or principally garaged. This includes those 'autos' you acquire ownership of after the policy begins provided they are required to have [no-fault] benefits in the state where they are licensed or principally garaged." (Carolina Policy at CA 00 01 03 06, Business Auto Coverage Form, ¶ A). The meaning of the word "own" is not defined elsewhere in the Carolina policy.

Carolina seeks to have the Court construe this term according to the statutory definitions that appear in the Michigan Vehicle Code and the No-Fault Act. However, it is settled that where a term is not defined in an insurance policy, it is accorded its commonly understood meaning. *Twichel v. MIC General Insurance Corp.*, 469 Mich. 524, 534 (2004). According to the Merriam-Webster Online Dictionary, to "own" means "to have or hold as property: possess" or "to have

power or mastery over."[8] This definition is consistent with the construction of the word articulated by the Michigan Supreme Court in a similar context. *Twichel, supra* at 534-35 ("Reference to dictionary definitions indicates that *possession, control* and *dominion* are among the primary features of ownership.") (emphasis in original) (citing *Merriam Webster's Collegiate Dictionary* (10th ed. 1977) (defining "owned as to "have or possess"); *Webster's Encyclopedic Unabridged Dictionary of the English Language* (Deluxe ed., 1994) (listing various definitions of "owned," such as "to acknowledge as one's own; recognized as having full claim, authority, power, dominion, etc."); *American Heritage Dictionary of the English Language* (3d ed., 1993) (defining "own" as "[t]o have or possess" and "ownership" as "[l]egal right to the possession of a thing"). In the opinion of the Court, this definition of the word "own" - which relies heavily upon the evidence of possession, as opposed to the manner in which an object is legally titled – most accurately reflects O&I's relationship with the tractor-trailer here, where Carlina expressly assumed "exclusive possession, control, use and responsibility for the operation of the equipment" through the end of the trip lease. (Trip Lease at ¶ 2). Proof that the equipment may have been the legal property of another entity is not dispositive, inasmuch as O&I was the only company with the authority to possess the vehicle through the end of the trip lease, and thus "owned" it in the sense that the term would be commonly understood in ordinary usage.[9] Accordingly, the Court rejects

---

[8] www.merriam-webster.com/dictionary/own?show=1&t=1315159302 (last visited September 19, 2011).

[9] This construction of "ownership" under the contract is also consistent with the statutory definition of "owner" under § 500.3101 the Michigan Insurance Code, which provides in relevant part that an owner means:

(I)   A person renting a motor vehicle or having the use thereof, under a lease or otherwise, for a period that is greater than 30 days.

Carolina's argument that the tractor-trailer at issue was not covered under its policy because it was not "owned" by O&I.

Finally, the Court does not agree with Carolina's effort to avoid liability under its policy on the theory that it was not Snyder's employer at the time of the accident. In order to determine the priority of insurers who may be liable for the provision of no-fault benefits under Michigan law, the Court looks to Mich. Comp. Laws. § 500.3114. Subsection (1)[10] of that statute indicates that an injured person (or his her family member), who is insured under a no-fault insurance policy, must seek benefits from his own insurer. *Belcher v. Aetna Cas. and Sur. Co.,* 409 Mich. 231, 252-253 (1980) (citing *Underhill v. Safeco Ins. Co.*, 407 Mich. 175, 191 (1979)). However, Michigan courts have held that subsection (3) takes priority and requires the insurer of the furnished vehicle to provide PIP benefits where the injury occurs to "[a]n employee . . . who suffers accidental bodily injury while an occupant of a motor vehicle owned or registered by the employer . . . ." Mich. Comp. Laws § 500.3114(3). *See State Farm Mut. Auto. Ins. Co. v. Sentry Ins.,* 91 Mich. App. 109, 114–115 (1979) (it was intent of legislature to "place the burden of providing no-fault benefits on the insurers of these motor vehicles, rather than on the insurers of the injured

---

This is especially the case in light of evidence provided by Snyder which, if true, suggests that he entered into trip leases with O&I on at least twenty-five different occasions in the thirteen months preceding the accident, resulting in O&I having exclusive use, possession, and control over the rig for at least fifty four non-consecutive days. Michigan courts have imputed ownership to commercial trucking lessees under similar circumstances. *See e.g. Integral Insurance Co. v. Maersk*, 206 Mich. App. 325, 332 (1994); *Paul v. Bogle*, 193 Mich. App. 479, 489 (1992).

[10]Mich. Comp. Laws § 500.3114(1) provides, in relevant part that "Except as provided in subsections (2), (3), and (5), a personal protection insurance policy described in section 3101(1) applies to accidental bodily injury to the person named in the policy, the person's spouse, and a relative of either domiciled in the same household, if the injury arises from a motor vehicle accident."

individual."). Courts have described the policy behind this rule as one which promotes predictability, in that "coverage in the 'commercial setting' will not depend on whether the injured individual is covered under another policy, and . . . benefits will be speedily paid without requiring a suit to determine which of the two companies will pay what is admittedly due by one of them."). *Id.* Moreover, this exception has been extended to apply to those individuals who are self-employed. *Celina Mut. Ins. Co. v. Lake States Ins. Co.*, 452 Mich. 84, 89 (1996) ("We believe that it is most consistent with the purposes of the no-fault statute to apply § 3114(3) in the case of injuries to a self-employed person. The cases interpreting that section have given it a broad reading designed to allocate the cost of injuries resulting from use of business vehicles to the business involved . . . .").

Recently, in *Besic v. Citizens Ins. Co. of the Midwest*, 290 Mich. App. 19, 32 (2010), the Michigan Court of Appeals rejected an argument similar to the one that has been proffered here by Carolina; namely, that a truck-driver was ineligible for PIP benefits under § 3114(3) because he was self-employed as an independent contractor. The court held that inasmuch as Besic was injured in an accident while occupying a vehicle statutorily owned by his employer (i.e. the motor carrier that had been leasing his vehicle for more than thirty days), § 3114(3) controlled the analysis and required the motor carrier's insurer to provide Besic with PIP benefits. A similar analysis applies here. Snyder is a self-employed trucker who gave exclusive possession, control, and use of his equipment to O&I, thus making it an "owner" under the trip lease, the Carolina policy, and the statute, as noted *supra*. Carolina's pleadings provide no analysis of *State Farm, Celina, Besic* or any related cases. Because there is no genuine issue of a material fact that (1) the trip lease had not ended on March 16th, and (2) Snyder was an employee who was injured while

occupying a motor vehicle owned by his employer, the Court concludes that Snyder is entitled to look to the insurer of the furnished vehicle (here, Carolina) to provide him with PIP benefits. Mich. Comp. Laws § 500.3114(3).

As a final matter, Snyder asserts that he is entitled to receive attorney's fees from National without regard as to whether it is actually responsible for paying PIP benefits to him. To that end, Snyder claims that he has been wrongly denied benefits during the pendency of this priority dispute, inasmuch as none of the companies paid him as required by Mich. Comp. Laws § 500.3148(1) as follows:

> (1) An attorney is entitled to a reasonable fee for advising and representing a claimant in an action for personal or property protection insurance benefits which are overdue. The attorney's fee shall be a charge against the insurer in addition to the benefits recovered, if the court finds that the insurer unreasonably refused to pay the claim or unreasonably delayed in making proper payment.

*Id.* It is true, as Snyder notes, that when the only question is which of two insurers should pay, it is unreasonable for an insurer to refuse payment of benefits. *Regents of University of Michigan v. State Farm Mut. Ins. Co.,* 250 Mich. App. 719, 737 (2002). Nevertheless, the general rule, which was articulated in *Regents,* is subject to exceptions, including where the delay is "the product of a legitimate question of statutory construction, constitution, or even a bona fide factual uncertainty." *Kalin v. DAIIE*, 112 Mich. App. 497, 509-510 (1982).

Here, aside from asserting that he has not been paid during the pendency of the priority dispute, Snyder has neither established nor proven that National or any of the other insurers "unreasonably refused" to pay him benefits. Accordingly, his request for the Court to keep National as a party in this lawsuit solely on this basis must be, and is, denied. *See Clute v. General Acc. Assur. Co. of Canada*, 177 Mich. App. 411, 420 (1989) ("it is clear that the Legislature did

not intend for no-fault insurers to pay all claims submitted without reviewing the claims for lack of coverage, excessiveness, or fraud. Where a reasonable dispute exists as to coverage or the amount of benefits owing, the insurer is allowed to contest the claim under the act without penalty.").

IV.

For the reasons that have been stated above, the request by National for the entry of a summary judgment in its favor is granted. For identical reasons, the request for the entry of a summary judgment by Praetorian is also granted. However, Carolina's request for a summary judgment in its favor is denied. This lawsuit is dismissed with prejudice.

IT IS SO ORDERED.

Date: <u>September 27, 2011</u>       <u>S/Julian Abele Cook, Jr.</u>
      Detroit, Michigan       JULIAN ABELE COOK, JR.
      United States District Court Judge

<u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that the foregoing Order was served upon counsel of record via the Court's ECF System to their respective email addresses or First Class U.S. mail to the non-ECF participants on September 27, 2011

      <u>s/ Kay Doaks</u>
      Case Manager